**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Crim. No. 24-10 |
| | * | |
| ROBERT BOOKSHAR | * | |
| | * | |
| | * | Hon. William Stickman IV |
| | * | |

## SENTENCING MEMORANDUM

Under Rule 11(c)(1)(C), both parties agree on one thing: the right sentence falls between 17 and 22 years. Every crime involving minors is serious. The mandatory minimums reflect that. So does the agreed range. So does the fact that Mr. Bookshar will register as a sex offender and pay restitution for most or all of his life after release. But this case differs in kind from the typical CSAM production case that often resolves for a 20-year (c) plea in this district and elsewhere. Robert Bookshar never had sexual contact with a minor. He never attempted to. He exploited no relationship with any child. He threatened, cajoled, and blackmailed no one. During the "live calls" he watched online, provided by an Instagram account called "Zoey's Club," he never appeared on screen or spoke to the minor victims. And he never distributed or shared the clips he screen-recorded from those streams with anyone. Those facts meaningfully separate his conduct—and his likelihood of reoffending—from offenders who did those things. Federal sentencing must account for those shades of grey to reach a fair, just, and proportionate result.

The other § 3553(a) factors point the same direction: to the low end of the agreed range. Seventeen years in federal prison, followed by supervised release and lifetime sex-offender registration, is a crushing punishment. By any measure it is "sufficient" to deter a 49-year-old man with no criminal history, a long record of hard work and community service, and a background of

past trauma, untreated depression, and worsening pornography addiction. All of which helps explain the dark path he took during one of the lowest and loneliest periods of his life.

As the Court will hear at sentencing, Mr. Bookshar is ashamed and remorseful for what he did and for the harm he caused the minors whose videos he viewed. No sentence this Court imposes will condemn him more harshly than he condemns himself. Many nights, he lies awake on his cell cot and wishes he would die. But Mr. Bookshar is more than his crime. He is the man who volunteered as a firefighter from the day he turned 14 and worked as an EMT for many years starting at 16—saving lives while witnessing death and trauma from a young age. He is the man who cared dutifully for his mother through her battle with blood cancer, and who spiraled deeper into depression when she died in 2023. And he is the man who has used his time in custody productively to the best of his ability—completing programming available in pretrial detention and turning to faith for refuge and hope. *See* Butler County Prison Certificates, attached as **Exhibit A.** His family's letters attest to his character, his service, and the support waiting for him on release. *See* Family Letters, attached as **Exhibits B-I.**

Against that full picture—which the Court must consider—17 years is what fairness and proportionality require. It is not lenient. Mr. Bookshar will leave prison a much older man, having taken every rehabilitative and treatment opportunity BOP offers. Given his family medical history and his own serious medical issues, he may not leave prison at all. His crime, while serious, warrants nothing longer or more life-shattering than that. His age, history, and conduct reflect low recidivism risk. And 17 years sits within the range both parties have agreed is appropriate, with due regard for the guidelines and the statutory minimum. Indeed, as many courts have now recognized,

the CSAM guidelines reflect a harsh departure from the Sentencing Commission's ordinary, evidence-based approach that does not provide a reliable anchor for a fair sentence.

For all these reasons, discussed below, the Court should accept the parties' plea agreement and sentence Mr. Bookshar to 17 years.

*   *   *

"[T]he responsibility confronting a district court judge when he or she sentences a convicted defendant is an awesome one." *United States v. Faulks*, 201 F.3d 208, 213 (3d Cir. 2000). "Additional months in prison are not simply numbers. Those months have exceptionally severe consequences for the incarcerated individual." *United States v. Jenkins*, 854 F.3d 181, 192 (2d Cir. 2017). "They also have consequences both for society which bears the direct and indirect costs of incarceration and for the administration of justice which must be at its best when, as here, the stakes are at their highest." *Id.*

That is why "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Concepcion v. United States,* 142 S. Ct. 2389, 2393 (2022). The guidelines are "only one of the factors for a district court to weigh," and the Court "may not presume that the guidelines range is reasonable." *United States v. Arrelucea-Zamudio*, 581 F.3d 142, 147 (3d Cir. 2009). A within-guidelines sentence requires no less justification than one outside them. And every sentence must be "sufficient, but not greater than necessary" to achieve the aims of sentencing. 18 U.S.C. § 3553(a).

Those strictures demand special care in CSAM cases. As the Third Circuit has warned, "[c]hild pornography is so odious, so obviously at odds with common decency, that there is a real risk that offenders will be subjected to indiscriminate punishment based solely on the repugnance of the crime and in disregard of other Congressionally mandated sentencing considerations." *United States v. Goff*, 501 F.3d 250, 260 (3d Cir. 2007). To reach a fair sentence, "revulsion over these crimes can not blind [courts] to the individual circumstances of the offenders who commit them." *United States v. Olhovsky*, 562 F.3d 530, 551 (3d Cir. 2009). The evil of the material itself "must not drive us to forget that it is not severe punishment that promotes respect for the law, it is appropriate punishment." *Id.*

## I. A 17-year sentence is proportionate to Mr. Bookshar's offense and avoids the unwarranted disparities a higher sentence would create.

Start with a basic point: "the amount by which a sentence deviates from the applicable Guidelines range is not the measure of how 'reasonable' a sentence is. Reasonableness is determined instead by the district court's individualized application of the statutory sentencing factors." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010). In *Olhovsky*, the Third Circuit reversed even a *below*-guidelines six-year sentence in a CSAM case as unreasonably harsh. The district court's reasoning showed it had been "so appalled by the offense that it lost sight of the offender." 562 F.3d at 551.

The Court's analysis should begin with the range both parties negotiated: 17 to 22 years. Courts "rel[y] on the adversarial system to bring just and fair results in the cases before it." *Smith v. United States*, 277 F. Supp. 2d 100, 109 (D.D.C. 2003). A plea agreement that is the "result of arms' length negotiation between capable counsel … should be accepted if it is reasonable." *United States v. C.R. Bard, Inc.*, 848 F. Supp. 287, 288 (D. Mass. 1994); *see also United States v. Iron Teeth*,

No. 12-50076, 2013 WL 38970, at *2 (D.S.D. Jan. 3, 2013) ("If both sides are represented and an arms-length negotiation takes place, that is usually sufficient to ensure an appropriate bargain.").

The parties' considered judgment—not the guidelines—should anchor the analysis. This agreement was carefully negotiated, and it tracks sentencing practice in this district and beyond. The government has commonly agreed to—and courts commonly accept and impose—sentences of 20 years or less even in CSAM production and other sex-crime cases involving the physical, sexual abuse of a child. *See* Gov't Sent. Memo (ECF 62) in *United States v. Michael Wilson*, CR 22-91, at 7 (W.D. Pa. 2023) (agreed 20-year sentence for defendant who sexually abused his stepdaughters and recorded CSAM was "not unreasonable, and certainly would not be anomalous in the context of production of child pornography and trafficking in child pornography sentences within the Western District of Pennsylvania.").

A sample:

| NAME | NUMBER | DESCRIPTION |
|---|---|---|
| *United States v. Daniel Kundrat* | CR 17-169 WDPA | **17-year sentence** in CSAM production case involving physical, sexual abuse of a minor coupled with recording those sex acts and attempting to sell the videos online. |
| *United States v. Michael Wilson* | CR 22-91 WDPA | **20-year sentence** in CSAM production case involving physical, sexual contact with stepdaughter and recording of stepdaughters engaging in sexual activity with each other. |
| *United States v. Jacob Kolonis* | CR 20-146 WDPA | **20-year sentence** in CSAM production case involving three minor victims. |

| NAME | NUMBER | DESCRIPTION |
|---|---|---|
| *United States v. James Muir* | CR 24-269 WDPA | **20-year sentence** in CSAM production case involving physical, sexual contact with stepdaughter. |
| *United States v. Markell Smith* | CR 20-346 WDPA | **17 ½ year sentence** in CSAM production case involving physical, sexual abuse of a minor and threats. |
| *United States v. James Schwarz* | CR 24-50 WDPA | **20-year sentence** in CSAM production case involving physical, sexual abuse of a minor. |
| *United States v. Anthony Cerasi* | CR 21-479 WDPA | **16-year sentence** in CSAM production case involving physical, sexual abuse of minor in the defendant's custody. |
| *United States v. Matthew Gourley* | CR 20-253 WDPA | **15-year sentence** in CSAM production case involving physical, sexual abuse of a minor. |
| *United States v. Michael Heinrich* | CR 1:17-13 WDPA | **15-year sentence** in CSAM production case involving physical, sexual abuse of a minor. |
| *United States v. James Jordan* | CR 22-313 WDPA | **10-year sentence** in sex trafficking case involving physical sexual contact with a minor transported across state lines. |
| *United States v. Scott Payne* | CR 18-13 WDPA | **18-year sentence** for coercing or enticing minor to engage in sexual activity involving physical, sexual contact with three minors. |
| *United States v. Mark Kriss* | CR 22-248 WDPA | **74-month sentence** in sex trafficking and CSAM receipt case involving allegations of physical, sexual contact with minor. |
| *United States v. Donoho* | 76 F.4th 588 7TH CIR | **17 ½ year sentence** in attempted CSAM production case involving a defendant video recording his niece's genitals. |

| NAME | NUMBER | DESCRIPTION |
|---|---|---|
| *United States v. Roy Naim* | CR 1:13-660 EDNY | **15-year sentence** in CSAM production case involving former camp counselor who solicited sexually explicit videos of a minor he previously counseled. |
| *United States v. Jeffrey Price* | 775 F.3d 828 7TH CIR. | **18-year sentence** in CSAM production case where defendant with a "history of sexually abusing children" took sexually explicit photographs of his daughter and put them on the internet. |
| *United States v. Patrick Baxter* | 179 F.4th 73 1ST CIR. | **20-year sentence** in CSAM production case where defendant was convicted *at trial* in case involving distribution of videos of minor's genitals over the internet. |
| *United States v. Puglisi* | 458 Fed.Appx. 31 2D CIR. | **15-year sentence** in CSAM production case for defendant convicted at a jury trial and who had "provided the victim various material enticements … in exchange for sex." |

Unlike those defendants, Mr. Bookshar is not accused of ever having physical, sexual contact with any minor—much less of threatening, coercing, or exploiting a relationship with a child he knew. He was an online viewer and purchaser of CSAM who, on the dates relevant to the two production counts, paid to watch what he believed were "live" streams offered by an Instagram account calling itself "Zoey's Club." His production liability rests on his decision to screen-record portions of those streams; without it, his conduct would sound in receipt or access with intent to view. There is no allegation he ever distributed or shared those brief recordings, nor that he ever tried to. And in all of the "live" streams, the minor depicted was alone—these were not videos of minors being abused or assaulted by another person.

None of this excuses or minimizes his crime. It isn't offered to. But it meaningfully distinguishes his production conduct from the (unfortunately) mill-run CSAM production defendant who records himself sexually abusing a child—often a child he knows and is trusted to care for. The Sentencing Commission's most recent report on production offenses bears this out: 60.7% of production offenders were "physically present" with the minor during the offense; 60.3% "maintained a position of trust over a minor victim as a family member or other close relationship"; and 37.5% were alleged to have committed contact sex offenses against the victim beyond the production offense itself. *See* U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography – Production Offenses*, pp. 29–30, 35, 41 (2021) (link). None of that aggravating conduct is present here.

"[C]ourts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct." *Dorvee*, 616 F.3d at 187; *see also Gall v. United States*, 552 U.S. 38, 55 (2007) (affirming sentence where it was "perfectly clear" that the district court had "also considered the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated."). "[C]hild pornography crimes fall within a spectrum," and "the harshest penalties should be reserved for the worst crimes." *United States v. Price*, No. 09-30107, 2012 WL 966971, at *12 (C.D. Ill. Mar. 21, 2012), *aff'd*, 775 F.3d 828 (7th Cir. 2014). On that spectrum, "[w]hether a child pornography offender has had or has attempted to have contact with children is an important distinction." *Jenkins*, 854 F.3d at 191; *see, e.g., Dorvee*, 616 F.3d at 187 ("Dorvee, who never had any contact with an actual minor, was sentenced by the district court to 233 months of incarceration. What is highly ironic is that the district court justified its 233–month sentence based on its fear that Dorvee would sexually assault a child in the future.").

Mr. Bookshar negotiated a plea to a range that dips reasonably below the sentences commonly imposed on offenders who—unlike him—sexually abused minors or engaged in other aggravating conduct. And the low end of that range remains brutally severe. As the table shows, 17 years matches or barely trails the sentences imposed on many who had sexual contact with a child to produce their CSAM. It far exceeds the sentences imposed on many who sexually abused children but never recorded it. A low-end sentence "is needed in this case in order to avoid unwarranted sentencing disparities but also to avoid unwarranted sentencing similarities among defendants convicted of dissimilar conduct." *Price*, 2012 WL 966971, at *12.

There are also good reasons why the guidelines should not—and often don't—drive sentencing in CSAM cases the way they might elsewhere. "The Guidelines are an exceedingly blunt tool in the child pornography context." *United States v. Muzio*, 966 F.3d 61, 71 (2d Cir. 2020) (Underhill, J., dissenting); *see also United States v. Huffstatler*, 571 F.3d 620, 623 (7th Cir. 2009) ("[P]erhaps for good reason, the government did not take issue with Huffstatler's premise that the child-exploitation guidelines lack an empirical basis."); *Price*, 2012 WL 966971, at *10 ("[T]his Court joins numerous other courts in expressing concern with the overly harsh sentences that result from the application of the child pornography sentencing guidelines.").

An advisory range offers a "rough approximation of sentences that might achieve § 3553(a)'s objectives only when it is the product of empirical data and national experience, guided by a professional staff with appropriate experience." *Arrelucea-Zamudio*, 581 F.3d at 155 n.12 (cleaned up). The CSAM guidelines are not that. The Commission has instead been forced into "constantly reacting to Congress's repeated directives, and the penalties for child pornography offenses that were steadily, and often dramatically, increasing." *United States v. Grober*, 624 F.3d

592, 604–05 (3d Cir. 2010); *see also United States v. Shipley*, 560 F. Supp. 2d 739, 744 (S.D. Iowa 2008) ("[T]he guidelines for child exploitation offenses were not developed using an empirical approach by the Sentencing Commission, but rather were mainly promulgated in response to statutory directives."); U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing* 72–73 (Nov. 2004) ("Much like policymaking in the area of drug trafficking, Congress has used a mix of mandatory minimum penalty increases and directives to the Commission to change sentencing policy for sex offenses.").

Driven by that pressure, the Commission crafted guidelines that "skew offense levels upward such that the Guideline does not appropriately distinguish between the least culpable and most culpable offenders." *Price*, 2012 WL 966971, at *11. "Because the Guidelines do not reflect the Commission's unique institutional strengths," the Court should "afford[] them less deference than it would to empirically-grounded guidelines." *United States v. Baird*, 580 F. Supp. 2d 889, 895 (D. Neb. 2008).

The danger posed by guidelines unmoored from empirical grounding is anchoring. "It is important to distinguish the guidelines' intended, salutary effect—promoting consistency and proportionality in sentencing—from the unintended anchoring effect that the guidelines can exert." *United States v. Ingram*, 721 F.3d 35, 40 n.2 (2d Cir. 2013) (Calabresi, J., concurring). "Research has shown that giving a sentencing official an initial value, even one that is known to be arbitrary, can influence the length of a sentence." Ryan W. Scott, *Inter-Judge Sentencing Disparity After Booker: A First Look*, 63 Stan. L. Rev. 1, 45 (2010); *see also Ingram*, 721 F.3d at 40 (Calabresi, J., concurring) ("When people are given an initial numerical reference, even one they know is random, they tend (perhaps unwittingly) to 'anchor' their subsequent judgments—as to

someone's age, a house's worth, how many cans of soup to buy, or even what sentence a defendant deserves—to the initial number given.").

That anchoring danger is why the guidelines should play a limited role here. The better anchor sits in the plea agreement itself: a range of 17 to 22 years, negotiated at arms' length by counsel familiar with this district's sentencing practices and this case's facts. That range already prices in the gravity of the offense and the statutory minimum. And within it, the facts point down, not up: no sexual contact, no attempted contact, no exploited relationship, no threats, no distribution. Measured against the sentences imposed on defendants in other cases—many of whom sexually abused children and received the same or barely longer sentences—17 years for Mr. Bookshar is not lenient. It is an incredibly harsh sentence that keeps like cases alike and different cases different. Section 3553(a)(6) demands nothing less.

## II. Mr. Bookshar's history and characteristics support a 17-year sentence.

Robert Bookshar was born in Uniontown, Pennsylvania, into a house ruled by a controlling, abusive father. His mother, Antoinette, raised Robert and his siblings largely alone. His parents lived together, but Robert describes his mom as a "single mother" and his father as "just there." His father, Benjamin, was hardest on Robert. He beat him with a paddle—and made Robert and his siblings build the paddles he hit them with. He "terroriz[ed]" and "bull[ied]" Robert around the house. PSR ¶ 92.

Robert was 10 when he found his father's pornographic magazines in the garage. He marks that discovery as the start of a lifelong pornography addiction—one that worsened through adulthood and in the period leading up to this offense. At 7, his parents briefly split after his father tried to sleep with his boss's wife. Robert remembers helping his dad pack his things to go.

School brought no relief. Robert had no friends and was always lonely. So at 14, he sought refuge outside the home by volunteering at the local fire department, spending his teenage years around 30-year-old firefighters who drank heavily at the firehouse. PSR ¶ 93. They were the closest thing he had to friends. Robert does not recall being sexually abused himself—but he remembers a cousin exposing himself and demanding oral sex when Robert was young. Robert refused. PSR ¶ 94. At 16, he began working as an EMT. That work exposed him—from a very young age—to suicides, medical deaths, and gruesome injuries. But he was proud of the work and stuck with it, serving as an EMT for many years and volunteering with the Republic, Turtle Creek, and Wilkins Fire Departments throughout adulthood.

After high school, Robert attended Oklahoma State University and graduated from California University of Pennsylvania. He worked three jobs through college and drank heavily to cope with his depression. He quit drinking after graduation. The depression stayed—and it was never treated. Work became nearly all he did. He poured himself into every job and logged grueling hours.

In 2014, Robert became an Allegheny County 9-1-1 dispatcher, a job he held for nine years. It looked like the natural next step after his EMT and fire service. Instead, it ground him down further. He sometimes worked 80 hours a week in mandatory overtime, often on midnight shifts, and almost had a day off—especially during COVID, when the call center was understaffed. He was always working. Always alone. "I've never felt so lonely in my life," he says now. At night, he turned obsessively to adult pornography, hoping to "feel less lonely" and "less empty." His sister Lori writes that during this period, "he would come home from work, look at his guns[,] and consider taking his life." Ex. B.

His depression and loneliness peaked in the few years before this offense. In 2021, his mother was diagnosed with multiple myeloma—a blood cancer. She fought it for two years with Robert at her side, supporting and caring for her throughout. His cousin, Nadine Cape, writes that she "witnessed firsthand the strength, patience, and tenderness he displayed while supporting her through some of the most difficult moments of her life." Ex. E. But "[w]hile he remained strong for her sake," the family "saw the emotional toll it would t[ake] on him." *Id.* "After comforting his mother and ensuring she was cared for," Nadine writes, "he would step away and privately struggle with the pain of watching someone he loved suffer." *Id.* When his mother died in 2023, Robert was devastated. Lori writes: "She was truly his rock, his stability, and support. I noticed during the time that she was deteriorating … his demeanor had changed drastically. I saw a person I never knew in my life. I knew he was at his lowest point. I had no idea that he went down this path of committing this awful crime." Ex. B.

But he did. As his mother deteriorated and work consumed his life, Robert's internet pornography addiction worsened. At first, it was adult pornography only. But in the period before this offense, his depression and addiction took him to darker places online. For Robert, all of it was an attempt to numb himself—an outlet for crushing loneliness and depression. And the disinhibition and detachment of the online environment fueled his escalation, normalizing the sexualization of the people on his screen and dulling his awareness of the harm. *See generally* John Suler, *The Online Disinhibition Effect*, Cyberpsychology & Behavior, vol. 7, No. 3 (2004) (link); Jonah R. Rimer, *Internet sexual offending from an anthropological perspective: analysing offender perceptions of online spaces,* Journal of Sexual Aggression (2016) (link).

Robert has never perceived himself as having actual sexual interest in children, and he has never had—or been accused of having—any inappropriate contact with a child. His conduct was exclusively online. *See* Innocent Lives Foundation, *Why Predators Watch Child Pornography* (link) ("Some people use child pornography as an emotional escape and distraction from real life. A study completed in 2013 looked at offenders and the why behind their actions. Offenders shared that child pornography became a 'source of relief' and a way to 'escape' their negative emotions or experiences which include: Depression, Anxiety or stress, Sexual frustration, loneliness."); *see also* Kelly Babchishin et al., *The Characteristics of Online Sex-Offenders: A Meta-Analysis*, 23 Sexual Abuse 92 (2010) (link) (concluding that "online offenders, compared with offline offenders, have greater self-control and more psychological barriers to acting on their deviant interests."); *see, e.g.*, Shelley L. Clevenger et al., *A Matter of Low Self-Control? Exploring Differences Between Child Pornography Possessors and Child Pornography Producers/Distributers Using Self-Control Theory*, 28 Sexual Abuse 555 (2016) (link) (finding online offenders have greater victim empathy and greater levels of self-control than offline offenders).

Robert has not wasted his time in custody. Since his arrest, he has strengthened his relationship with his sister Lori and completed what programming is available at the Butler County Jail—51 certificates and counting. *See* Ex. A. He has also studied the Bible and participated in other faith-based activities to sustain himself through an extended pretrial detention.

Robert's health will make any sentence riskier, and harder to serve. Robert weighs 320 pounds. He has severe sleep apnea requiring nightly CPAP use, high blood pressure, and hypothyroidism, for which he takes several medications. Despite a lifetime of depression, he has never received any mental health treatment or medication. PSR ¶ 100.

Collectively, Robert's history and characteristics provide strong support for his request that the Court sentence him to the (still-very-harsh) lower-edge of the parties' agreed range:

**Abuse & Trauma.** Robert's upbringing—the beatings, the loneliness, and the early sexualized experiences described above—helps explain his struggles with depression and pornography addiction, and ultimately his offense conduct. Decades of research shows that "[r]epeated exposure to traumatic events during childhood can have dramatic and long-lasting effects." Dr. Richard G. Dudley, Jr., *Childhood Trauma and Its Effects: Implications for Police*, at 1 HARVARD KENNEDY SCHOOL & NIJ: NEW PERSPECTIVES IN POLICING (2015) (link). There are also "strong associations between all types of trauma and the development" of "behavioral addictions," like the pornography addiction that contributed to Robert's offense here. Yafit Levin, et al. *The association between type of trauma, level of exposure and addiction,* Addictive Behaviors, vol. 118 (link). And "greater exposure to sexuality in the home"— such as "the availability of S[exually] E[xplicit] M[aterials]" like Robert's father's pornography; Robert's inappropriate awareness, at age 7, of his father's sexual pursuit of a woman not his mother; or his cousin's indecent exposure and sexual propositioning of Robert—is "a key determinant of persistent P[roblematic] S[exual] B[ehavior]." Camille Mori, et al. *Exposure to sexual content and problematic sexual behaviors in children and adolescents: A systematic review and meta-analysis,* CHILD ABUSE & NEGLECT, vol. 143 (September 2023).

**Depression.** Robert's lifelong, untreated depression—and his descent into deeper depression and pornography addiction through loneliness, overwork, and his mother's death—also supports a 17-year sentence. These struggles do not "excuse the serious crimes" he committed, but they provide context that "help[s] to explain him." *United States v. Somerville*, 463

F. Supp. 3d 585, 603 (W.D. Pa. 2020). And "[i]n the context of a request for a variance … mental health … issues are mitigating factors in and of themselves." *United States v. Inman*, No. 8:21-60, 2023 WL 4201164, at *7 (D. Neb. June 27, 2023); *see, e.g.*, *United States v. Oliver*, 608 F. Supp. 3d 1113, 1120 (M.D. Ala. 2022) (granting downward variance based on defendant's "mental health history, and the need to provide him effective treatment for his posttraumatic stress disorder and substance-abuse disorder."); *United States v. Carter*, 506 F. Supp. 3d 1204, 1212–13 (M.D. Ala. 2020) ("A downward variance allows the court to provide Carter with critical care and treatment in the most effective manner because of the unsuitability discussed above of the correctional setting for giving him the drug and mental-health treatment he requires.").

**Work Ethic & Service.** Robert's work history and his service to his community and family point the same way. As nearly all of the family members who have written letters on his behalf attest, Robert devoted a good portion of his life from age 14 on to serving his community as a volunteer firefighter, EMT, and, later, a 9-1-1 dispatcher. *See United States v. Sunchild*, 648 F. App'x 595, 598 (9th Cir. 2016) (observing that district court granted a "significant downward variance" based on factors including the defendant's "public service"); *United States v. Santibanez-Salais*, No. 10-0256, 2011 WL 831283, at *6 (D.N.M. Feb. 8, 2011) (granting "a variance" to defendant based on factors including defendant's strong history of "work in the United States."). His self-sacrificing care for his mother as she died from cancer—even as he struggled at work and privately battled untreated depression—reflects the same character his family describes in their letters: a man who shows up for others even at great cost. The "significant positives in [Mr. [Bookshar's] character and background" are appropriate sentencing considerations, because the Court must "consider the entirety of [his] background and character,

not just the negatives reflected in his criminal history." *United States v. Santoya*, 493 F. Supp. 2d 1075, 1081 (E.D. Wisc. 2007); *see also id.* (varying downward because defendant had "significant positives in his character and background, as evidenced by the letters from his family and fiancé"); *United States v. Pauley*, 511 F.3d 468, 474 (4th Cir. 2007) (affirming downward variance partly because defendant "was a good father and teacher," which was an "appropriate" consideration because it is "tied to § 3553(a)(1)'s directive that the court consider the history and characteristics of the defendant.").

**Law-Abiding Life.** The Court should also weigh Robert's lack of criminal history heavily. "[A] district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed into a criminal history category of I, in its § 3553(a) analysis." *United States v. Huckins*, 529 F.3d 1312, 1319 (10th Cir. 2008). That's because "[g]enerally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend." *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005). Robert has no criminal history to speak of and has never spent a day in jail before this case.

**Age & Health.** Section 3553(a)'s "mandate" also "includes consideration of a defendant's age and medical condition." *United States v. White*, 506 F.3d 635, 644 (8th Cir. 2007). Robert is 49 and will be in his 60s when released from a 17-year sentence. That matters for several reasons. First, "[t]he age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age." U.S.S.G. § 5H1.1 (Policy Statement).[1] As a

[1] This provision was deleted from the latest iteration of Guidelines as part of a larger revision to remove most "departures" to simplify the sentencing process. But the Sentencing Commission made clear that the deletion of departure provisions "does not reflect a determination by the

result, according to Sentencing Commission and other research, "[o]lder offenders [are] substantially less likely than younger offenders to recidivate following release." U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, p. 3 (2017).

Contrary to popular perception, individuals convicted of CSAM offenses often have significantly lower recidivism rates than those convicted of other types of crimes. *See* Amelia Clark, et al. *Recidivism rates among online child sexual exploitation material offenders: systematic review and meta-analyses,* Journal of Forensic Psychiatry & Psychology, vol. 36, No. 6, at 862 (link) ("The current systematic review and meta-analyses revealed that the rates of recidivism amongst online CSEM offenders in the last decade were low for individuals going on to commit any further sexual offences, contact sexual offence, CSEM offences and violent offences."). And as with all crimes, "[y]ounger sex offenders [are] more likely than older sex offenders to be arrested for another sex offense post-release." Mariel Alper, et al., *Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up,* DOJ Bureau of Justice Statistics (2019) (link). On top of that, "the likelihood of new sexual offenses decline[s] the longer individuals with a history of sexual offending remain sexual offense-free in the community," with those who avoid recidivism for 10 to 15 years after release "no more likely to commit a new sexual offense than individuals with a criminal history that [does] not include sexual offenses." R. K. Hanson, et al., *Reductions in risk based on time offense-free in the community: Once a sexual offender, not always a sexual offender*, Psychology, Public Policy,

Commission that the rationale underlying the deleted departure provisions is no longer informative and does not serve as a limit to the information courts may consider in imposing a sentence." U.S.S.C., *Amendments to the Sentencing Guidelines*, p. 82 (April 30, 2025) (available at link). Accordingly, it was "the Commission's intent that judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts, or any other relevant factors, to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)." *Id.*

and Law, 24(1), 48-63 (link). Robert will be in his 60s upon release, with no criminal history and no allegation of any contact sexual offense. He is among the lowest risks to recidivate.

Robert's age also matters because of his significant medical issues—obesity, severe sleep apnea, high blood pressure, and hypothyroidism. Both of his parents died of cancer in their early 70s, and multiple other family members have died in their 50s or 60s. Incarceration accelerates the normal "aging process" in older inmates "to an average of 11.5 years older than their chronological ages after age 50." US DOJ Nat'l Inst. of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmate*s (2004). And as DOJ's Inspector General and courts have recognized, despite BOP's attempts to provide medical care, prison bureaucracy and security needs mean that "aging inmates experience delays receiving medical care." DOJ OIG, *The Impact of an Aging Population on the Federal Bureau of Prisons*, at p. ii (2015) (link); *see also id.* ("For example, using BOP data from one institution, we found that the average wait time for inmates, including aging inmates, to be seen by an outside medical specialist for cardiology, neurosurgery, pulmonology, and urology to be 114 days."); DOJ OIG, *Review of the Federal Bureau of Prisons Medical Staffing Challenges*, at p. 1 (2016) (link) ("[T]he BOP's total medical staff was approximately 17 percent less than what the BOP projected was necessary to provide what it considers to be 'ideal' care."); *see, e.g.*, *United States v. Smith*, 464 F. Supp. 3d 1009, 1019 (N.D. Iowa 2020) ("Medical records, however, indicate that the BOP knew or should have known that Smith had signs of lung cancer that could have been addressed much sooner.").

**Danger in Prison.** Robert's age and first-time-inmate status matter for another reason: as a middle-aged man convicted of a sex offense who has never served time in jail, let alone federal prison, he will face serious stress, adjustment difficulties, and safety risks while serving his

sentence. *See* US DOJ Nat'l Inst. of Corrections, *supra.* Older, first-time inmates are often "easy-prey" for "more experienced predatory inmates." *Id.* Those dangers are especially acute for someone who will carry the sex-offender label into prison without any of the experience or know-how needed to stay safe behind bars.

**Progress & Family.** Robert's conduct in custody—completing significant programming despite limited availability, participating in faith-based activities, and strengthening family relationships—also favors him at sentencing. The Court should consider his "post-offense conduct, including his rehabilitation while in custody," as "part of the § 3553(a) analysis." *United States v. Tuitele,* No. 13-593, 2020 WL 5167527, at *3 (D. Haw. Aug. 31, 2020). The outpouring of family support in the attached exhibits—especially from his sister Lori—matters too, because "the single best predictor of successful release from prison is whether [a] former inmate has a family relationship to which he can return." Solangel Maldonado, *Recidivism and Parental Engagement*, 40 FAMILY L. Q. 191, 191 (2006) (link); *see also id.* ("[P]risoners who maintain family ties during imprisonment are less likely to violate parole or commit further crimes."). Though he lost his mother before his arrest, Robert has his sister and extended family standing by him, ready to support him on release.

**Nature of Deterrence.** Finally, while the government often argues for longer sentences based on a generalized need for "deterrence," there is little empirical support for the notion that tacking on more years of prison serves any penological purpose. Research shows it is the certainty of punishment, not the particular length of a sentence, that drives any deterrent effect. Nat'l Inst. of Justice, *Five Things About Deterrence* (2014) (link). In fact, not only does it appear that "[s]ending an offender to prison isn't a very effective way to deter crimes … [p]risons actually may have the

opposite effect." *Id.*; *see also id.* ("… compared to non-custodial sanctions, incarceration has a null or mildly criminogenic impact on future criminal involvement.") (quoting Daniel S. Nagin et al., *Imprisonment and Reoffending*, at pp. 115-200, Crime and Justice: A Review of Research, vol. 38 (2009)); Francis Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S (2011) ("Using an evidence-based approach, we conclude that there is little evidence that prisons reduce recidivism and at least some evidence to suggest that they have a criminogenic effect. [B]eyond crime saved through incapacitation, the use of custodial sanctions may have the unanticipated consequence of making society less safe.").

Thus, where a defendant, like Mr. Bookshar, has come forward with compelling, personalized bases for a marginally shorter (and still extremely punishing) sentence, it is no answer to invoke a countervailing interest in deterrence—at least if it is deterrence as an empirical reality that we care about. "[L]engthy prison sentences cannot be justified on a deterrence-based, crime prevention basis," Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 202 (2013) (link), because "[e]mpirical studies have shown that longer sentences have minimal or no benefit on whether offenders or potential offenders commit crimes." Brennan Center for Justice, *What Caused the Crime Decline?*, at p. 26 (2015) (link). And that remains true regardless of the type of crime at issue. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28–29 (2006); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010).

As a result, "the crime prevention benefit" of longer sentences "falls far short of the social and economic costs" that ensue when they are imposed. NIJ, *Five Things About Deterrence* (2014) (link). And "[i]n view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effect on individuals sentenced, their family, society[,] and our economy, parsimony in incarceration is to be prized." *United States v. Ramirez*, 2018 WL 1221129, at *3 (E.D.N.Y. Mar. 8, 2018) (cleaned up).

* * *

Seventeen years is a long time. Mr. Bookshar will serve it in federal prison, far from the family who have stood by him. He will leave in his 60s—if his health allows him to leave at all—and will live all or most of the rest of his life as a registered sex offender, under supervision, paying restitution. That is severe punishment by any measure. For a 49-year-old first-time offender whose crime, though serious, involved no contact with any child, no threats or coercion, and no distribution or dissemination of the few screen recordings he made, it is "sufficient" many times over. Anything more would be punishment for punishment's sake—greater than necessary, and unmoored from the conduct, the offender, and the sentences imposes on other defendants in numerous other cases.

For the reasons above, Mr. Bookshar respectfully asks the Court to accept the parties' Rule 11(c)(1)(C) plea agreement and impose a sentence of 17 years' imprisonment.

Respectfully submitted:

ROBERT BOOKSHAR

By counsel:

/s/ *Jake Morrison*
JAKE MORRISON
Assistant Federal Public Defender